SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Dana Kearney (A-50-24) (089877)**

**Argued February 3, 2026 -- Decided July 27, 2026**

**JUSTICE NORIEGA, writing for a unanimous Court.**

In this appeal, the Court considers defendant Dana Kearney's argument that his counsel was ineffective, and his conviction must be reversed, because a State witness paid his legal fees, creating a conflict of interest.

Defendant was charged with murder and other offenses in connection with the August 2013 stabbing death of Christopher Sharp. Sharp was the cousin of Alicia Boone, with whom defendant was in a relationship. During police questioning, Boone first told officers that defendant said, "[Sharp] got cut." In a later statement, she said defendant stated that he had "poked" Sharp.

Prior to trial, Boone hired attorney Neil G. Duffy to represent defendant. She later testified that she met with Duffy on a total of three occasions, the last time in 2014, and that their discussions were limited to payment of defendant's legal fees.

At trial, the State called Boone as a witness. On cross-examination, Duffy asked why Boone had changed her account of what defendant told her about Sharp. Boone testified that she was held at the police station for about 16 hours without being allowed to use a bathroom, which she agreed "broke" her. Duffy asked whether Boone was coloring her testimony to protect defendant; she stated that she and her family knew defendant had not killed Sharp. Duffy also asked questions through which Boone confirmed that she had not visited Duffy's office since 2014; had not directly communicated with him other than paying defendant's legal fees; and had hired her own attorney -- unaffiliated with Duffy -- to prepare her for trial. In summation, Duffy argued that Boone had been pressured to change her statement from "[Sharp] got cut" to "I poked [Sharp]" and was not a credible witness.

Defendant was found guilty on all charges. Following an unsuccessful direct appeal, defendant filed a petition for post-conviction relief (PCR), asserting ineffective assistance of counsel on the basis that Duffy had a conflict of interest. Alternatively, defendant argued he was entitled to an evidentiary hearing. The PCR court denied the motion without a hearing. The Appellate Division affirmed. 479

1

N.J. Super. 539, 544-45 (App. Div. 2024). The Court granted certification, limited to whether the payment of a criminal defendant's legal fees by a person who later testifies as a witness for the State creates a conflict of interest. 260 N.J. 327 (2025).

**HELD:** There was no conflict of interest here -- per se or actual. The Court sets forth recommendations to clarify best practices for handling third-party payment of legal fees in criminal matters.

1. An attorney's duty of loyalty requires exclusive loyalty to the client, without diversion of that loyalty in favor of another person or the lawyer's own self-interest. In the context of PCR, a defendant who demonstrates that counsel's loyalty was divided and that he suffered corresponding prejudice may establish a violation of the right to effective assistance of counsel, warranting post-conviction relief. The Court has adopted a two-tier framework for addressing conflict-of-interest allegations. First, courts consider whether the alleged conflict at issue constitutes a per se conflict -- a conflict so inherently fraught with divided loyalties that prejudice to the defendant is presumed, and reversal is required, unless the defendant has knowingly and intelligently waived the conflict. If a per se conflict is not found, courts next consider whether the alleged potential conflict is an actual conflict, and, if so, whether a great likelihood of prejudice resulted. The actual conflict standard is a flexible, fact-sensitive inquiry in which courts examine the specific facts of each case to determine whether the attorney's representation was materially limited by responsibilities to another client, a third party, or by the lawyer's own interests. A defendant may consent to an actual conflict, provided the waiver is knowing, intelligent, and voluntary. But, under no circumstances should waiver be inferred from a silent record. (pp. 15-20)

2. In the context of third-party payment of legal fees, the Rules of Professional Conduct require that the client provide "informed consent," which is defined as agreement to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks and reasonably available alternatives. Once an actual conflict of interest has been established, however, waiver requires a knowing, intelligent, and voluntary relinquishment of the right to conflict-free counsel, and it must be made on the record with the trial court ensuring that the defendant fully understands the potential hazards of the conflict. Each form of consent must be analyzed according to the specific context and stage of the case. (pp. 20-21)

3. A criminal defendant's ability to retain private counsel is unique among attorney-client relationships, particularly due to the barriers created by detention. For members of the private bar, the assistance of family or friends may be the only means available to connect an attorney to a detained defendant. This dynamic introduces the potential for a conflict of interest as soon as a third party becomes

2

involved in the attorney-client relationship. At the same time, however, a per se rule excluding all such arrangements would be both impractical and unfair, particularly for defendants in custody who must often rely on family, friends, or others to secure private counsel on their behalf. In In re State Grand Jury Investigation, 200 N.J. 481 (2009), the Court expressly rejected a per se rule of disqualification in all third-party payer situations and instead set forth a fact-specific six-part test to assess whether a third-party payer's relationship with counsel led to a material limitation resulting in an actual conflict. The Court reviews that test. (pp. 21-24)

4. The record here demonstrates that Boone's involvement with Duffy was limited to the payment of legal fees. There is no evidence that Duffy's representation of defendant was materially limited by Boone's payment, nor is there any evidence of divided loyalty or impaired advocacy. The alleged division of counsel's loyalties was purely hypothetical, and Duffy's conduct throughout the trial reflected undivided loyalty to his client. Because defendant has failed to establish the existence of a conflict, the Court does not reach the question of informed consent. A third party paying the legal fees of a defendant's counsel does not create a per se conflict, and defendant has failed to establish an actual conflict. And because defendant's allegations amount to nothing more than unsupported assertions, they are insufficient to warrant an evidentiary hearing. (pp. 24-27)

5. To provide clarity and protection for both counsel and client, the Court recommends best practices for all criminal cases involving third-party payment of legal fees: (1) preparation of a standalone document, separate from the retainer agreement, memorializing the identity of the payer and the nature of the payment arrangement; (2) the client's signature of the document as acknowledgment and indication of informed consent to the arrangement; (3) an ongoing duty to update; (4) maintaining the document on file for production in the event of a dispute or post-conviction challenge, with appropriate safeguards for confidentiality; and (5) the designation of a primary payer when multiple individuals wish to contribute to the defendant's legal fees. In adopting these best practices, the Court seeks to balance the practical realities of criminal defense with the need to safeguard the defendant's right to conflict-free counsel. However, an attorney's failure to adopt these best practices does not, by itself, establish a conflict of interest or entitle a client to relief for ineffective assistance of counsel. The Court recommends that the Criminal Practice Committee review and develop a model form for this purpose and consider whether, in certain circumstances, additional steps should be required. (pp. 27-30)

**AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and HOFFMAN join in JUSTICE NORIEGA's opinion.**

3

# SUPREME COURT OF NEW JERSEY
## A-50 September Term 2024
### 089877

State of New Jersey,

Plaintiff-Respondent,

v.

Dana Kearney,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
479 N.J. Super. 539 (App. Div. 2024).

| Argued | Decided |
|--------|---------|
| February 3, 2026 | July 27, 2026 |

Rachel E. Leslie, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Rachel E. Leslie, of counsel and on the briefs, and Steven M. Gilson, Designated Counsel, on the briefs).

Erin M. Campbell, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Erin M. Campbell, of counsel and on the briefs).

Kaili E. Matthews, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Jennifer Davenport, Acting Attorney General, attorney; Kaili E. Matthews, of counsel and on the brief).

In this appeal, we consider defendant Dana Kearney's argument that his counsel was ineffective, and his conviction must be reversed, because a State witness paid his legal fees, creating a conflict of interest.

Alicia Boone, who was in a relationship with defendant, paid his legal fees and subsequently testified as a witness for the State. Following his jury trial, defendant was convicted of first-degree murder, aggravated assault, endangering the injured victim, hindering prosecution, and witness tampering. After the Appellate Division affirmed defendant's conviction and sentence, he filed a petition for post-conviction relief (PCR) alleging, among other claims, that he was denied effective assistance of counsel because Boone paid his legal fees, creating a conflict of interest.

Because we conclude that there was no conflict of interest -- per se or actual -- we affirm the Appellate Division's judgment. In addition, we set forth recommendations at the end of this opinion to clarify best practices for handling third-party payment of legal fees in criminal matters.

I.

A.

In August 2013, defendant was in Boone's house, along with his cousin,
Joseph Kearney; Shane Timmons; Tori Evelyn, Timmons's cousin; and
Boone's cousin, Christopher Sharp, the victim in this matter. Shortly after
midnight, the men got into a physical altercation. During the commotion,
Boone gathered her children to leave; one of them later recalled seeing
defendant with a folding knife during the confrontation. Boone made her way
to her car with her children, intending to drive to her mother's house. Before
she pulled away from the house, defendant ran to the vehicle, climbed in, and
left with Boone and the children.

After dropping the children off at her mother's house, Boone and
defendant remained outside, where he said to Boone that "something was
wrong with [Sharp]," and that they needed to return to her house. Boone later
told police that when she asked him to explain, defendant stated that he had
"poked" Sharp.[1]

Boone and defendant returned to her house where they found Sharp lying
on the floor. Defendant joined Joseph Kearney, Timmons, and Evelyn in the

---

[1] This statement became a central point of contention during the trial. As
discussed below, Boone also said that defendant stated, "[Sharp] got cut."

3

living room where the victim lay motionless. Evelyn described them all as "in shock." Eventually, Evelyn persuaded them to leave with him in his van.

Boone's stepfather returned to the house to check on Sharp after seeing him in an inebriated state earlier that same day. He found Sharp on the floor unresponsive and called the police. When first responders arrived at 2:04 a.m., Sharp had no pulse and was lying in a pool of blood. According to one of the responders, "it . . . looked like he had been there for a little while." It was later determined that Sharp died from several stab wounds to the chest.

B.

A Middlesex County grand jury indicted defendant, Timmons, and Joseph Kearney on various counts including conspiracy to commit aggravated assault, murder, endangering an injured victim, hindering apprehension, and witness tampering. The defendants were tried together before a jury.

Prior to trial, Boone hired attorney Neil G. Duffy to represent defendant. She later testified that she met with Duffy on a total of three occasions, the last time in 2014, and that their discussions were limited to payment of defendant's legal fees.

During the trial, the State called Boone as a witness. Both the State and defense questioned Boone about statements to the police in which she gave differing accounts of defendant's alleged admission. During direct

4

examination, the State focused on Boone's second statement to police -- that defendant exclaimed, "I poked him," referring to Sharp. On cross-examination, Duffy countered by focusing on Boone's earlier statement in which she told the police that defendant said Sharp "got cut."

In his cross-examination of Boone, Duffy asked the following:

> DUFFY: What was it about that conversation with Carlos Rodriguez that had you change your testimony?
>
> BOONE: He insinuated I wasn't going home.
>
> DUFFY: Were you scared at that point?
>
> BOONE: Very.
>
> . . . .
>
> DUFFY: So, then you come out for the second statement about 4:00 in the afternoon. And then you change it to he said something like I may have poked him; right?
>
> BOONE: Yes.
>
> DUFFY: After you told them that I may have poked him, they let you go home?
>
> BOONE: Not immediately. I was there for about sixteen hours I think in all. So, not immediately. I also was not allowed to go to the bathroom. So --
>
> DUFFY: Wait a minute. Whoa. Did you just say you weren't allowed to go to the bathroom?
>
> . . . .

5

BOONE: . . . So, when I went in to speak with him, I urinated on myself, it was just whatever they want. So, they -- eventually I was able to go to the bathroom. They found an officer somewhere. And they'll take me to the bathroom. And whatever they want.

DUFFY: So, in a sense they kind of broke you.

BOONE: I guess so. I was going home.

On redirect, the State asked Boone to describe her conversation with Detective Rodriguez:

BOONE: Everyone had left. So, I asked Detective Rodriguez, I said, -- I said, everybody's leaving. And he said, yeah. . . . I said, am I being locked up for something? And he said, well why do you ask that? And I said, because you let everyone leave but me. And he said, now that's a good observation. I insinuated that meant I was not going home, because all he had to say was yes or no. And that's not what he said.

The State then questioned Boone about her second statement to the detective. She testified:

BOONE: Then [Rodriguez] told me, come on, Alicia. He said, come on, you got something else to tell me. I said, no I don't have anything else to tell you. I said, I told you everything. He said, no, come on, you got something else . . . he went on and on with that[.] I said, look, [Kearney] is -- is mean. . . . He said to the other detectives, you know what, I think Alicia has something else she want[s] to tell you guys. And that's when I went in there and made my second statement.

Boone testified that she felt intimidated and that she only went to the police the second time to change one part of her statement -- that defendant said "he

6

poked him" instead of "he got cut" -- and that once she changed that part of her statement, she was allowed to go home.

The State played the video of Boone's second statement for the jury in which Boone stated she was afraid of defendant and feared for the safety of her children because he was "mean," he had a "past," and because he had "people." Boone ultimately conceded that she was crying during the video out of fear of defendant; despite her comments about police intimidation, Boone indicated that she never reported that or mentioned it to anyone other than her lawyer. She stated that she never directed her lawyer to act on that information. She also testified that some of the officers were "very good to [her]."

On re-cross examination, Duffy asked whether Boone was "coloring" her testimony solely to protect defendant, to which she responded, "my family and I are very much aware of who killed my cousin. We are much aware that it was not Dana Kearney."

On redirect, the State questioned Boone about her relationship with Kearney:

> STATE: So, on August 21st, 2013, after you were allowed to go home, you came back to the police and you again told them that Dana said that he poked Chris, right?
>
> BOONE: Yes.

7

STATE: Ms. Boone, you love Dana, right?

BOONE: Yes. I love all of them actually, but yes I do love Dana.

STATE: Like you told us before, you hired Mr. Duffy to represent him, right?

BOONE: Yes.

STATE: And you're paying for his services?

BOONE: Yes.

STATE: And Dana is the father of your child, right?

BOONE: Yes.

STATE: And since this incident, you've spoken to him thousands of times. Is that fair to say?

BOONE: Yes.

STATE: You've seen him hundreds of occasions, right?

BOONE: Yes.

STATE: You don't want to see anything bad to happen to him, right?

BOONE: No.

STATE: Certainly not because of anything that you say, right?

BOONE: Exactly.

8

Duffy followed up with several clarifying questions through which Boone confirmed that she had not visited Duffy's office since 2014, nor had she directly communicated with him other than paying defendant's legal fees, and that she had hired her own attorney -- unaffiliated with Duffy -- to prepare her for trial.

In summation, Duffy challenged Boone's credibility and motives for changing her initial statement from "[Sharp] got cut" to "I poked [Sharp]." Duffy contended that Boone had been pressured to change her statement and was not a credible witness.

The jury returned a verdict of guilty on all charges. Defendant was sentenced to an aggregate term of fifty years' imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. The Appellate Division affirmed defendant's conviction and sentence. This Court denied certification.

C.

Defendant filed a petition for PCR. He asserted ineffective assistance of counsel on the basis that Duffy had a conflict of interest because he was paid by the State's witness, which denied him a fair trial. Alternatively, defendant argued he was entitled to an evidentiary hearing.

9

The PCR court denied defendant's motion without an evidentiary hearing.[2] The court held that defendant failed to establish a prima facie case of ineffective assistance of counsel and failed to demonstrate a per se or actual conflict in Duffy's representation; therefore, defendant was not entitled to an evidentiary hearing.

D.

On appeal, the Appellate Division affirmed the PCR court's decision. State v. Kearney, 479 N.J. Super. 539, 544-45 (App. Div. 2024). Regarding the alleged conflict of interest, the court first analyzed the third-party payer issue in the context of per se conflicts. Id. at 558-61. As to defendant's claim that he was never advised of a potential conflict, the appellate court "decline[d] to hinge a finding of a per se conflict and constitutional violation upon such a bald assertion" for three reasons. Id. at 560 (quotation omitted). First, "noncompliance with an ethics requirement, while relevant, does not automatically trigger per se civil or criminal consequences." Ibid. (citing Baxt v. Liloia, 155 N.J. 190, 197-98 (1998)). Second, the trial record makes it "readily inferable" that defendant must have been fully aware that his

---

[2] The trial court and the parties learned, prior to the hearing, that Duffy had passed away in the years since the trial.

girlfriend Boone paid his legal fees.[3]  Ibid.  Third, Duffy zealously advocated on behalf of defendant's interests and "exhibited loyalty to his client."  Id. at 560-61 (citing RPC 1.7 and State v. Cottle, 194 N.J. 449, 463 (2008)).

Relying upon the same evidence adduced in the per se analysis, the appellate court concluded that there was also no actual or potential conflict, and no great likelihood of prejudice.  Id. at 561-62.  The court reiterated that Duffy forcefully advocated and attempted to "undermine the incriminating portions of Boone's police statements."  Id. at 562.

For those reasons, the appellate court ultimately determined that an evidentiary hearing was unnecessary.  Id. at 562-63.

We granted Kearney's petition for certification, limited to the issue of whether the payment of a criminal defendant's legal fees by a person who later testifies as a witness for the State creates a conflict of interest, requiring reversal of the conviction or other relief.  260 N.J. 327 (2025).  We also granted leave to the Attorney General to appear as amicus curiae.

---

[3]  The Appellate Division also recommended that, going forward, private criminal defense counsel make a practice of documenting the client's informed consent in writing or by other recorded means.  Id. at 561.

11

II.

A.

Defendant urges this Court to reverse his convictions and find either a per se or an actual conflict, or, at minimum, that he is entitled to an evidentiary hearing.

Defendant argues that a per se conflict of interest exists whenever a third party hires or pays a defendant's legal fees and has an adverse interest to the defendant in the proceeding. Defendant contends that an adverse interest is present when the third party's criminal liability may turn on the defendant's testimony or cooperation against the third party. Defendant asserts that such an arrangement inherently risks dividing defense counsel's loyalty and erodes public confidence in the integrity of the legal profession.

Additionally, defendant claims that the Appellate Division failed to analyze whether he made a knowing and voluntary waiver of the conflict resulting from Boone's payment. Defendant highlights that there is no proof in the record that defendant gave informed consent, as the appellate court noted. Defendant argues that even if he had provided informed consent, such consent satisfied only the Rules of Professional Conduct (RPCs) and did not waive the conflict itself. Instead, defendant argues that his constitutionally

12

protected right to effective assistance of counsel should not rest on a presumption of waiver where the record is silent.

Alternatively, defendant argues that the relationship between Boone and his attorney resulted in an actual conflict that adversely affected his attorney's representation of him. Upon a showing of an actual conflict, defendant argues that the prevailing federal case law dictates that he should not be required to prove a higher degree of prejudice than what the Federal Constitution requires.[4]

Defendant contends that, at minimum, he has presented a prima facie case of a potential conflict, as well as ineffective assistance of counsel, thus entitling him to an evidentiary hearing.

### B.

The State asks this Court to affirm, asserting that the Appellate Division and the trial court correctly denied defendant's PCR petition. The State contends that no per se conflict rule governs this case and that, if such a rule were imposed, it would likely harm defendants by denying them the financial

---

[4] Because defendant argues for the first time before this Court that our state standard is less protective than that announced in Cuyler v. Sullivan, 446 U.S. 335 (1980), we do not reach that issue in this appeal, see Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).

13

help to retain private counsel, as well as burden the Office of the Public Defender.

The State contends that the actual conflict analysis is the appropriate standard, but that the facts of this case fail to support the existence of an actual conflict or resulting prejudice to defendant. The State points to defendant's allegations -- that Boone's interests conflicted with defendant's interests; that Boone was primarily focused on shielding herself from criminal liability; and that Boone sought to retaliate against defendant -- and asserts that no credible evidence in the record supports any of those bare claims. The State highlights that defendant has not demonstrated divided loyalties and that Boone's testimony reflects little to no interaction with Duffy. The State contends that, even if a conflict of interest exists, defendant has failed to demonstrate that he has been prejudiced. Finally, the State asks this Court to reject any arguments defendant raises for the first time and to affirm the finding of the Appellate Division that defendant failed to establish a prima facie claim of ineffective assistance of counsel and is therefore not entitled to an evidentiary hearing.

The Attorney General joins the State's arguments and adds that "a waiver made following informed consent should generally be memorialized in situations where the third-party payer may be called as a potential witness by the State." Although the requirement of a writing "might appear burdensome,"

14

the Attorney General asserts, it will "actually create[] a number of benefits for a lawyer."

III.

A.

Our review of a PCR court's findings is "necessarily deferential," yet we review legal conclusions de novo. State v. Hernandez-Peralta, 261 N.J. 231, 246 (2025) (quoting State v. Nash, 212 N.J. 518, 540 (2013)). As noted above, defendant alleges that the conflict of interest that arose between his attorney and the State's main witness was insurmountable and deprived him of his constitutional right to counsel. Whether a conflict-of-interest deprived defendant of his constitutional right to counsel is a legal question; accordingly, our review of this issue is de novo. See State v. Harris, 181 N.J. 391, 419 (2004); Hernandez-Peralta, 261 N.J. at 246.

The ethical foundation for an attorney's duty of loyalty is codified in the Rules of Professional Conduct, specifically RPC 1.7. Under RPC 1.7(a),

> (a) . . . [A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict exists if
>
> > (1) the representation of one client will be directly adverse to another client; or
> >
> > (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's

15

responsibilities to another client, a former client, or a third person, or by a personal interest of the lawyer.

"The paramount obligation of every attorney is the duty of loyalty to his client." Cottle, 194 N.J. at 463. A criminal defendant places their fate in the hands of an attorney taking responsibility for their matter. The right to counsel is not merely the right to have an attorney present, but the right to effective assistance of counsel: counsel who provides the "client with undivided loyalty and representation that is 'untrammeled and unimpaired' by conflicting interests." State v. Norman, 151 N.J. 5, 23 (1997) (quoting State v. Bellucci, 81 N.J. 531, 538 (1980)). Put simply, that duty requires the attorney's exclusive loyalty to the client, without diversion of that loyalty in favor of another person or the lawyer's own self-interest. Id. at 23-24.

In the context of PCR, a defendant may challenge their conviction on the ground that a conflict of interest deprived them of the effective assistance of counsel. R. 3:22-2(a). A hallmark of the right to counsel is that "[t]here is no greater impairment of a defendant's constitutional right to counsel than that which can occur when his attorney is serving conflicting interests. The resulting representation may be more harmful than the complete absence of a lawyer." Bellucci, 81 N.J. at 538. Thus, a defendant who demonstrates that counsel's loyalty was divided and that he suffered corresponding prejudice

16

may establish a violation of the right to effective assistance of counsel, warranting post-conviction relief.

In Norman, this Court adopted a two-tier framework for addressing conflict-of-interest allegations. 151 N.J. at 24-25. Under that framework, courts first consider whether the alleged conflict at issue constitutes a per se conflict. Ibid. A per se conflict of interest arises in those rare circumstances in which the nature of the conflict is so inherently fraught with divided loyalties that prejudice to the defendant is presumed, and reversal is required unless the defendant has knowingly and intelligently waived the conflict. See ibid.; Cottle, 194 N.J. at 472.

The per se conflict rule is formulated as such to maintain "public confidence in the integrity of the bar" and the constitutional guarantee of effective assistance of counsel, Bellucci, 81 N.J. at 541, and it has been limited to those instances of conflict that create an "overriding concern of divided loyalties" so significant that the risk of prejudice is intolerable, see Cottle, 194 N.J. at 467 n.8. Examples of the limited application of the per se conflict rule include "simultaneous dual representations of codefendants," Norman, 151 N.J. at 24-25, and when an attorney is simultaneously "under indictment in the same county as his client" and is prosecuted by the same prosecutor's office, Cottle, 194 N.J. at 473.

17

In light of the serious nature of a per se conflict, a defendant may waive this type of conflict only if the defendant receives notice "in court and on the record" of their counsel's "predicament that may be adverse to the best interests of the client." Id. at 472. Once the situation is fully disclosed, "the defendant must knowingly, intelligently, and voluntarily agree to proceed with a conflict-tainted attorney," followed by their counsel's declaration "that despite the conflict[, they] 'reasonably believe[] that [they] will be able to provide competent and diligent representation'" to the client. Ibid. (quoting and citing RPC 1.7(b)(2)).

If a per se conflict is not found, courts next consider whether the alleged potential conflict is an actual conflict, and, if so, whether "a great likelihood of prejudice" resulted. Norman, 151 N.J. at 25. If such a showing is made, a "presumption of both an actual conflict of interest and actual prejudice will arise, without the necessity of proving [specific] prejudice." State v. Bell, 90 N.J. 163, 171 (1982).

The actual conflict standard is a flexible, fact-sensitive inquiry. The court examines the specific facts of the case to determine whether the attorney's representation was "materially limited" by responsibilities to another client, a third party, or by the lawyer's own interests. Cottle, 194 N.J. at 466; see also State v. Harvey, 176 N.J. 522, 529 (2003) (noting that the

18

Court's evaluation of an actual or apparent conflict must be "directed to 'something more than a fanciful possibility'" (quoting In re Op. No. 653 of the Advisory Comm. on Pro. Ethics, 132 N.J. 124, 132 (1993))). Thus, to seek disqualification of a conflicted attorney, "the asserted conflict 'must have some reasonable basis,'" id. at 529 (quoting In re Op. No. 653, 132 N.J. at 132); a bald assertion will be insufficient.

This Court has "recognized that when an 'attorney cannot or may not be able to pursue an unrestrained course of action in favor of a defendant because [of a conflict], his effectiveness as counsel has been hampered.'" Cottle, 194 N.J. at 468 (quoting State v. Land, 73 N.J. 24, 30-31 (1977)). If the limitation on decision-making is determined to be significant and there is a great likelihood that prejudice will result, the court may find an actual conflict. Norman, 151 N.J. at 25 (citing Bell, 90 N.J. at 171). The rationale for this approach ensures that defendants are not deprived of effective assistance of counsel due to conflicts that, while not per se, still pose a substantial risk to the fairness of the proceedings.

Nevertheless, the right to conflict-free counsel, though fundamental, is not absolute. Defendants may "surrender their constitutional rights to independent counsel," but there is a "strong presumption against waiver of fundamental rights.". Bellucci, 81 N.J. at 544 (quoting Land, 73 N.J. at 32

19

first and citing Glasser v. United States, 315 U.S. 60, 70 (1941) second).  Just as with per se conflicts, a defendant may consent to an actual conflict, provided the waiver is knowing, intelligent, and voluntary.  Cottle, 194 N.J. at 472.  But, under no circumstances should waiver be inferred from a silent record.  See ibid.

In the context of third-party payment of legal fees, the RPCs require that the client provide "informed consent," which is defined as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks and reasonably available alternatives to the proposed course of conduct." In re State Grand Jury Investigation, 200 N.J. 481, 495 (2009).  The concept of "informed consent" under the In re State Grand Jury Investigation standard refers to a prerequisite for ethically permitting a third-party payment arrangement:  the client must be adequately informed of the material risks and alternatives before agreeing to the arrangement.  Ibid.  This is one of several factors that must be satisfied to avoid a violation of the RPCs.  See id. at 495-96.

By contrast, once an actual conflict of interest has been established, the standard for waiver is more stringent.  In that context, waiver requires a knowing, intelligent, and voluntary relinquishment of the right to conflict-free counsel, and must be made on the record with the trial court ensuring that the

20

defendant fully understands the potential hazards of the conflict. See Norman, 151 N.J. at 35 (citing Bellucci, 81 N.J. at 544-45); Cottle, 194 N.J. at 472. Thus, while informed consent is a factor to be considered in evaluating the propriety of a third-party payment arrangement, a valid waiver of an actual conflict -- once established -- demands a higher level of judicial scrutiny and procedural formality. Each form of consent must be analyzed according to the specific context and stage of the case.

B.

A criminal defendant's ability to retain private counsel is unique among attorney-client relationships, particularly due to the barriers created by detention. Attorneys from the Office of the Public Defender can typically establish attorney-client relationships directly, without intervention of third parties. By contrast, for those members of the private bar, the assistance of family or friends may be the only means available to connect an attorney to a detained defendant. This dynamic introduces the potential for a conflict of interest as soon as a third party becomes involved in the attorney-client relationship. At the same time, however, a per se rule excluding all such arrangements would be both impractical and unfair, particularly for defendants in custody who must often rely on family, friends, or others to secure private counsel on their behalf.

21

Recognizing this, our case law requires careful scrutiny of third-party arrangements to ensure that the attorney's loyalty remains undivided and that the defendant's right to effective assistance of counsel is not compromised.

In re State Grand Jury Investigation provides the governing framework for analyzing conflicts arising from third-party payment of legal fees. 200 N.J. at 481. The case involved a grand jury investigation of a corporation and three employees for fraud. Id. at 486. The corporation hired counsel for the three employees and paid their legal fees. Ibid. We expressly rejected a per se rule of disqualification in all third-party payer situations. See id. at 494. Instead, we harmonized RPCs 1.8(f), 1.7(a)(2), and 5.4(c),[5] and articulated a fact-

_____

[5] Under RPC 1.8(f),

> (f)   A lawyer shall not accept compensation for representing a client from one other than the client unless:
>
> (1)  the client gives informed consent;
>
> (2)   there is no interference with the lawyer's independence of professional judgment or with the lawyer-client relationship; and
>
> (3)   information relating to representation of a client is protected as required by RPC 1.6 [(confidentiality of information)].

specific six-part test to assess whether a third-party payer's relationship with

counsel led to a material limitation resulting in an actual conflict. See id. at

491, 494-97. The factors are as follows:

> (1) The informed consent of the client is secured. . . .

> (2) The third-party payer is prohibited from, in any way, directing, regulating, or interfering with the lawyer's professional judgment in representing [the] client.

> (3) There cannot be any current attorney-client relationship between the lawyer and the third-party payer.

> (4) The lawyer is prohibited from communicating with the third-party payer concerning the substance of the representation of [the] client. . . .

> (5) The third-party payer shall process and pay all such invoices within the regular course of its business, consistent with [the] manner, speed[,] and frequency it pays its own counsel.

> (6) Once a third-party payer commits to pay for the representation of another, the third-party payer shall

---

Separately, under RPC 1.7(a)(2), "[a] concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer."

And lastly, RPC 5.4(c) states that "[a] lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services."

23

not be relieved of its continuing obligation to pay without leave of court brought on prior written notice to the lawyer and the client. . . .

[Id. at 496 (citations omitted).]

So long as the six conditions are satisfied, including informed consent and the absence of interference with the lawyer's professional judgment, no automatic conflict arises and a third-party payer is permissible. Id. at 494-95.

IV.

Against that legal framework, we turn to defendant's case. The potential conflict in this case arises from the fact that Boone, a State witness, hired and paid the legal fees for defendant's attorney, Duffy.

The record here demonstrates that Boone's involvement with Duffy was limited to the payment of legal fees, and that she had no substantive contact with Duffy regarding the case, had not visited his office since 2014, and retained her own attorney, unaffiliated with Duffy, to prepare for her trial testimony. There is no evidence that Duffy's representation of defendant was materially limited by Boone's payment, nor is there any evidence of divided loyalty or impaired advocacy.

To the contrary, Duffy zealously cross-examined Boone and challenged her credibility at trial. Duffy's cross-examination was effective and raised points that could have resonated with the jury, including highlighting the

24

contradictory statement "[Sharp] got cut," rather than the statement highlighted by the State, "I poked [Sharp]." Any suggestion that Duffy's strategy was compromised, or that he failed to pursue alternative lines of questioning due to a conflict, is speculative and unsupported by the record.

Moreover, Boone confirmed that her interaction with Duffy was limited and remote, and no question was raised about whether the financial relationship created any bias in her testimony. If anything, the State prompted the inquiry with Boone to highlight her possible motive to protect defendant through her testimony. In fact, Boone's re-cross examination culminated in her testimony that she and her family were aware of who killed her cousin, and that it "was not Dana Kearney." As the Appellate Division found, the alleged division of counsel's loyalties was "purely hypothetical," and Duffy's conduct throughout the trial reflected undivided loyalty to his client.

Admittedly, the record does not contain documentation of defendant's informed consent to the fee arrangement and, as we have previously stated, mere knowledge of the arrangement is not equivalent to informed consent. See In re State Grand Jury Investigation, 200 N.J. at 495. However, a violation of the RPCs, while relevant, is not dispositive, see Baxt, 155 N.J. at 197-98, especially where the defendant has failed to establish the existence of a conflict; accordingly, we do not reach the question of informed consent.

25

We therefore hold that defendant has failed to establish that his attorney provided ineffective assistance of counsel by virtue of a conflict of interest. A third party paying the legal fees of a defendant's counsel does not create a per se conflict, and under the facts presented, defendant has failed to establish an actual conflict.[6]

## V.

Defendant's claim that he is entitled to an evidentiary hearing is likewise unavailing. Defendant acknowledges that an evidentiary hearing would be "unlikely to shed meaningful light on whether the fee arrangement or Duffy's potential ethical violation affected his strategic decisions, nor on the question of whether Kearney gave informed consent to the arrangement." Even when the facts are viewed in the light most favorable to defendant, the record is devoid of any evidence that would support a prima facie showing of

---

[6] We note that, although the standards for an actual conflict of interest and for ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 692-96 (1984), and State v. Fritz, 105 N.J. 42, 52-53, 60 n.2 (1987), are closely related when the alleged deficiency arises from a conflict, they remain distinct legal inquiries. Here, defendant's Strickland/Fritz argument is little more than a fallback position, consisting of a recitation of the bare standard and relying solely on the fact that Boone paid his legal fees. Defendant offers no additional facts, evidence, or substantive arguments to support a claim of ineffective assistance of counsel beyond this third-party payment arrangement. Defendant offers no specific facts or evidence to establish a prima facie case of ineffective assistance. Because these contentions are neither developed nor substantiated in any significant way, we decline to address them further. See State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).

ineffective assistance of counsel. See State v. Preciose, 129 N.J. 451, 462-63 (1992). Defendant's allegations amount to nothing more than unsupported assertions, which are insufficient to warrant an evidentiary hearing. See Cummings, 321 N.J. Super. at 170 ("A petitioner must do more than make bald assertions that he was denied the effective assistance of counsel.").

## VI.

We recognize that third-party payment of legal fees is a common and often necessary feature of criminal defense practice, particularly for detained defendants who may not have direct access to private counsel. However, as this case demonstrates, such arrangements present unique risks of conflict and divided loyalty, especially when the payer is, or may become, a witness in the case. To address these risks and to provide clarity and protection for both counsel and client, we recommend the following best practices for all criminal cases involving third-party payment of legal fees:

1. Separate disclosure and consent document

Whenever an attorney accepts payment from a third party for a defendant's legal fees, the attorney should prepare a standalone document, separate from the retainer agreement, memorializing the identity of the payer and the nature of the payment arrangement.

27

## 2. Client acknowledgement and informed consent

The defendant should be provided with the name of the payer and should sign the separate document to acknowledge having been informed of the identity of the payer and consenting to the arrangement. That acknowledgement should make clear that the attorney's loyalty is owed solely to the defendant, and that the payer has no authority to direct the representation or influence strategy.

## 3. Ongoing duty to update

Because the fee structure and identity or status of the payer may change over the course of the representation, the attorney should update and re-execute this disclosure and consent document if there is any change in the identity, or status of the payer, such as the payer being designated as a witness for the State or otherwise becoming involved in the proceedings.

## 4. Filing and confidentiality

The Court does not require that this document be filed with the court in every case. However, in the event of a dispute or post-conviction challenge, the existence of such a document will be highly relevant. The document should be maintained in counsel's file and produced as needed, with appropriate safeguards for confidentiality.

28

## 5. Designation of a Primary Payer

To avoid confusion and administrative difficulties when multiple individuals wish to contribute to the defendant's legal fees, best practice is for the attorney to work with the defendant and their supporters to designate a single individual as the primary payer. This person will be responsible for collecting and forwarding payments to the attorney, and will be identified in the disclosure and consent document as the payer of record. While others may contribute funds to the primary payer, the attorney's relationship and payment arrangement will be memorialized with the designated individual. This approach ensures clarity, simplifies record-keeping, and maintains the integrity of the disclosure and consent process.

The existence of a signed, up-to-date disclosure and consent document will serve as evidence of the defendant's awareness and consent to the third-party payment arrangement. This protects both counsel and client by providing a clear record of disclosure and consent, thereby reducing the risk of later claims of undisclosed conflict.

In adopting these best practices, the Court seeks to balance the practical realities of criminal defense with the need to safeguard the defendant's right to conflict-free counsel. However, an attorney's failure to adopt these best practices

29

does not, by itself, establish a conflict of interest or entitle a client to relief for ineffective assistance of counsel.

We recommend that the Criminal Practice Committee review and develop a model form for this purpose and consider whether, in certain circumstances (such as when the payer is a known witness), additional steps, such as an in-court colloquy or filing under seal, should be required.

## VII.

The judgment of the Appellate Division is affirmed.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and HOFFMAN join in JUSTICE NORIEGA's opinion.

30